Frank J. Pino, J.
Petitioner brings this article 78 proceeding for an order directing respondents to forthwith restore him to his position of surface line operator in the New York City Transit Authority from which position he was dismissed by respondents, after a hearing, on May 18, 1964.
On November 4, 1963, petitioner was appointed from the appropriate list promulgated after an examination given by the Department of Personnel of the City of New York. It is his claim that prior to taking the examination, which was specially arranged for him for a Saturday, after sundown, he advised the City Civil Service Commission, through one of its employees, that he was a Seventh Day Adventist and could not and would not work on his Sabbath or between the hours of sundown on Friday to after sundown on Saturday, because of his religious scruples. He further claims that shortly after his appointment to the position and during the early part of his training period, he similarly advised his superiors at the Transit Authority. He admits, however, that the said superiors informed him, in the course of several conferences, in substance, that work assignments and particularly ‘ ‘ bus runs ’ ’ were given out according to established seniority rules which could not be violated by the Authority and which might require him to work during his Sabbath hours; that if he were assigned to such a “run”, the Authority would have no objection if he could work out a mutual exchange of days off with other employees, or what is commonly known as a “ swap ”; that in the event he could not work out such a “ swap ” he would either have to operate the bus during such hours or be subject to dismissal. He does not deny an interview with the respondent Joseph E. O’G-rady, chairman of the Transit Authority, on December 19, *30 1963, after petitioner was informed that charges were being preferred against him because he had persistently taken the position that if assigned to a “run” requiring him to work during his Sabbath he would refuse to do so; and that during said interview petitioner asked Chairman O’Grady to be assigned to a depot, claiming he was sure he could arrange it with other operators so that he would not have to work on his Sabbath; that then Chairman O’Grady assigned him to the Flatbush Garage but advised him that he would have to iron out his problem with his fellow employees or work on his Sabbath when so assigned, in accordance with respondent’s work rules.
It is undisputed that the said work rules, which permit respondents’ employees to select or “ pick ” their work assignments on a nondiscriminatory seniority basis, are incorporated in and form part of subsisting union contracts entered into between respondents and the respective collective bargaining representatives in surface transportation.
It is admitted that on Friday, January 17, 1963, although duly assigned according to respondent’s work rules to a “run” scheduled from 5:49 p.m. on January 17 to 2:03 a.m. on January 18, petitioner did not report for said assignment and refused to work because of his Sabbath observance and further, for the same reason, failed to report for duty on January 18 until 4 ;45 p.m. for his tour of duty which was scheduled to commence at 4:29 p.m. on that day. On January 20 petitioner was duly charged with misconduct and incompetence, for having violated the appropriate rules and regulations governing employees engaged in the operation of the New York City Transit Authority, in that he refused to report for duty and remained absent without authority as aforesaid. The charges were accompanied by his suspension from duty without pay.
On February 19, 1964 he was given a hearing upon the said charges before Referee Daniel Gutman, and the proceedings were suspended to give petitioner another chance to effect mutual exchanges of days off with other employees. He was accordingly thereafter assigned to the Fresh Pond Depot.
It is conceded that on Friday, March 6, 1964, at the last-mentioned depot, petitioner was again duly assigned to operate his bus until 7:12 p.m. on that day; but after operating part of the ‘ ‘ run ’ ’ he returned the bus to the garage at 5:45 p.m., refusing to complete the “run” because it extended into his Sabbath.
On March 11, 1964, petitioner’s hearing upon the above-mentioned charges was resumed and concluded. After a recom *31 mendation by the Hearing Referee that the charges preferred be found sustained, petitioner, on May 18, 1964, was dismissed from the service. The Referee found as follows: “ The Transit Authority must provide transportation seven days a week. This is common knowledge to all including those who seek to enter its service. Employees pick their tours of duty according to seniority. This, too, is common knowledge. The most desirable days off are Saturdays and Sundays, the days when children are home from school and families generally enjoy their leisure time together. By the process of seniority, employees who start Avith the least desirable tours of duty ultimately arrive, at the point in service, Avhere they can schedule the Aveekends for regular days off. Under the circumstances there is no alternative but to find the charges sustained.”
The first contention by petitioner is that a quasi-contractual relationship arose out of the conduct of the parties, to wit: that petitioner had advised the Civil Service Commission, before taking the examination, that he was a Seventh-Day Adventist and could not work during his Sabbath, but was nevertheless permitted to take the examination; that he advised respondents to the same effect, both upon his appointment and prior to the completion of his training, but nonetheless was alloAved to complete his training and was assigned to a depot for work; that under these circumstances there arose an obligation on the part of respondents to assign petitioner to employment that did not violate his freedom of religion.
From the facts there can be no doubt that petitioner knew of the terms upon which he was being assigned to duty. In any event, he was necessarily charged with knowledge of the provisions of the notice of examination which in part provide: £ ‘ Duties and responsibilities: To operate a bus or trolley coach in accordance with the rules and regulations of the New York City Transit Authority.”
Quasi contract is an obligation which the law creates in the absence of an agreement. It is invoked by the courts in situations involving unjust enrichment (Matter of St. John, 168 Misc. 17).
The court can find no authority, nor has petitioner furnished any, for the imposition of a quasi contract between the parties under the facts herein presented.
Petitioner’s principal contention is that his dismissal violated his right to the free exercise of his religion as guaranteed to him under the First Amendment and his right to equal protection and due process under the Fourteenth Amendment of the Constitution of the United States,
*32 It is well settled that while in the exercise of those fundamental human rights guaranteed under the First Amendment, including the exorcise of freedom of religion, the right to believe is absolute, the right to act is not; that conduct remains subject to regulation for the protection of society (Cantwell v. State of Conn., 310 U. S. 296; Reynolds v. United States, 98 U. S. 145).
In the area of both private and public employment, in particular, the conduct of individuals, as it relates to their religious scruples or other basic protected freedoms, has been consistently held to be subject to the terms of such employment, as those terms are affected by lawful agreements or by laws or regulations reasonably calculated to promote the public good and safety. (Otten v. Baltimore & Ohio R. R. Co., 205 F. 2d 58 [2d Circ. 1953]; Mitchell v. Pilgrim Holiness Church Corp., 210 F. 2d 879; United Public Workers of America v. Mitchell, 330 U. S. 75; Adler v. Board of Educ., 342 U. S. 485; Matter of James Council v. Donovan, 40 Misc 2d 744.)
Petitioner’s dismissal resulted only after long and commendable efforts on the part of respondents to assist him in his unfortunate plight. His assumption, nevertheless, that respondents have the power to assign him to work which will not interfere with his religious scruples is, however, without basis.
The case of Otten v. Baltimore & Ohio R. R. Co. (supra) is somewhat analogous to the instant case. There the defendant had entered into a closed shop agreement with the union representing its employees. The plaintiff, one of its employees, refused to join the union because of his religious scruples. After protracted negotiations seeking to accommodate plaintiff had failed, the defendant was compelled to dismiss him. The court, through Learned Hand, J., in affirming a denial of a temporary injunction, said in part (p. 61): “ The First Amendment protects one against action by the government, though even then, not in all circumstances, [Citing Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244]; but it gives no one the right to insist that in the pursuit of their own interests others must conform their conduct to his own religious necessities. A man might find it incompatible with his conscience to live in a city in which open saloons were licensed; yet he would have no constitutional right to insist that the saloons must be closed. He would have to leave the city or put up with the iniquitous dens, no matter what economic loss his change of domicil entailed. We must accommodate our idiosyncrasies, religious as well as secular, to the compromises necessary in communal life; and we can hope for no reward for the sacrifices this may *33 require beyond our satisfaction from within, or our expectations of a better world.”
Respondents are bound by lawful agreement to enforce the seniority rules which govern petitioner and all of his fellow employees, and to which he has chosen not to accommodate.
The respondents are charged with the proper operation of a public transportation system and are thus engaged in the performance of a governmental function (Public Authorities Law, § 1202, subd. 2). There can be no doubt, from long experience, that the seniority rules to which petitioner has refused to conform are the only fair way to assure that every man is treated on a nondiseriminatory basis with respect to work assignments. These time-honored rules are, therefore, most essential to the efficient and safe operation of the city transportation system.
The right of government, in the efficient fulfillment of its purposes, to make reasonable regulations to which all of its employees, regardless of their beliefs or scruples, must conform, is unquestioned.
In United Public Workers of America v. Mitchell (supra) involving the constitutionality of the Hatch Act, the court, after affirming the reasonableness of its prohibition, said at page 99: “ Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, ive see no constitutional objection.” (Emphasis supplied.)
Similarly here, since in the reasonable judgment of respondents the efficiency of the public transportation service for which they are responsible may be best obtained through inviolate seniority rules, this court can see no constitutional objection.
Respondents’ rules do not deny petitioner’s right to the free exercise of his religion. They do limit his choice between adherence to his scruples and employment as a surface line operator. Certainly, such limitation is not one which respondents may not properly make within the power delegated to them to provide an efficient public transportation system and thereby to promote and protect the welfare and safety of the citizens of the State. (Adler v. Board of Educ., supra.)
Respondents’ dismissal of petitioner from his position was proper and warranted and not arbitrary and capricious. The petition is accordingly dismissed.