**In re BRADLEES STORES, INC., et al., Debtors.**

**Bradlees Stores, Inc., Bradlees, Inc. and New Horizons of Yonkers, Inc., Plaintiffs,**

**v.**

**St. Paul Fire and Marine Insurance Company and St. Paul Surety, Defendants.**

Bankruptcy Nos. 00–16033 (BRL), 00–16035(BRL), 00–16036(BRL). Adversary No. 02–2400.

United States Bankruptcy Court, S.D. New York.

April 9, 2003.

---

308

Chadbourne & Parke LLP, by Howard Seife, Kenneth A. Caruso, Gregory Kerr, Andrew Rosenblatt, New York City, for St. Paul Fire and Marine Insurance Company.

Cadwalader, Wickersham & Taft, by John H. Bae, Joseph E. Field, Adam Rogoff, New York City, for Debtors.

Otterbourg, Steindler, Houston & Rosen, P.C., by Rosanne Finkel, Glenn B. Rice, New York City, for Post Confirmation Committee of Unsecured Creditors of Bradlees Stores, Inc.

White & Case LLP, by Frank L. Eaton, Miami, FL, for Stop & Shop Company.

Hermes, Netburn, O'Connor & Spearling, P.C., by Scott S. Spearling, Boston, MA, co-counsel for Stop & Shop Company.

## MEMORANDUM DECISION DENYING MOTION TO VACATE ORDER APPROVING SETTLEMENT OF ADVERSARY PROCEEDING

BURTON R. LIFLAND, Bankruptcy Judge.

St. Paul Fire and Marine Insurance Company ("St. Paul"), seeks an order, pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable herein by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), vacating an order entered by this Court on February 6, 2003 (the "Order"), approving a settlement (the "Settlement"), between St. Paul and plaintiffs Bradlees Stores, Inc., Bradlees, Inc. and New Horizons of Yonkers, Inc. (collectively, "Bradlees" or the "Debtors"), in connection with an adversary proceeding (the "Adversary Proceeding") commenced by the Debtors.

## Background

On December 26, 2000 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code"). Prior to the Petition Date, the Debtors operated 105 discount department stores in the northeastern United States. On January 4, 2001, this Court entered an order authorizing the Debtors to liquidate their entire inventory by conducting "going-out-of-business" sales (the "GOB Sales"). By February 5, 2001, the GOB Sales at all of the Debtors' stores had concluded, store operations had ceased and the Debtors have not had any retail employees since that time.

Prior to 1992, the Debtors operated as a wholly-owned subsidiary of Stop & Shop Companies, Inc. ("Stop & Shop"). In that capacity, all of the Debtors' insurance obligations including workers' compensation liabilities were covered under insurance policies held by Stop & Shop. On July 9, 1992, Bradlees became an independent corporate entity. At or about that time, St. Paul issued five surety bonds securing Bradlees' workers' compensation obligations in the states of Connecticut, Massachusetts, New Jersey, New Hampshire, and Pennsylvania (collectively, the "Surety Bonds"). In those states, Bradlees had acted as a self-insurer with respect to its workers' compensation liabilities. On July 2, 1992, Bradlees executed a General Agreement of Indemnity (the "Indemnity Agreement"), in favor of St. Paul that related to any bonds that St. Paul might issue with respect to obligations of Bradlees. As a precondition to issuing the Surety Bonds, St. Paul also required Bradlees to obtain an irrevocable letter of credit in favor of

St. Paul that secured Bradlees' obligations to St. Paul with respect to the Surety Bonds and the Indemnity Agreement.

On or about April 10, 1998, Bradlees, Inc. opened a general irrevocable letter of credit ("Letter of Credit") in favor of St. Paul at BankBoston in the amount of $15,825,000.00 that secured all of the Debtors' indemnification obligations to St. Paul under the Indemnity Agreement, including St. Paul's obligations under the Surety Bonds. Between the time the Letter of Credit was issued and the filing of the Debtors' bankruptcy cases, the amount of the Letter of Credit was reduced to $14,045,600.00.

As of early 2002, all of the Surety Bonds had been cancelled or terminated. Pursuant to the express terms of the Surety Bonds, St. Paul remains liable for Bradlees' future workers' compensation obligations resulting from employee injuries that occurred prior to the termination/cancellation of the Surety Bonds, up to the full penal sums of the Surety Bonds.

On January 22, 2001, St. Paul drew down in full the Letter of Credit. Since approximately January 2001, St. Paul has been administering Bradlees' workers' compensation claims except for claims which Stop & Shop has been paying.

On or about May 13, 2002, the Debtors filed a complaint (the "Complaint"), against St. Paul in the Adversary Proceeding asserting causes of action for: (i) unjust enrichment, (ii) money had and received, (iii) conversion, and (iv) breach of contract. The Complaint alleged that St. Paul was improperly holding "excess proceeds" from the Letter of Credit because St. Paul's exposure with respect to Bradlees' workers' compensation liabilities and related expenses was less than the remaining proceeds of the Letter of Credit. The parties conducted discovery and retained experts to conduct an actuarial analysis of Bradlees' estimated future losses and expenses arising from workers' compensation. The experts' analyses were limited to the post-July 1992 time because the parties believed that Stop & Shop had assumed all claims that occurred prior to July 9, 1992. This belief was buttressed by Stop & Shop's course of conduct. Stop & Shop had been paying the workers' compensation claims asserted against Bradlees for injuries resulting from events that occurred prior to July 9, 1992.

In January 2003, the Debtors and St. Paul filed motions for summary judgment. The Debtors sought judgment against St. Paul for approximately $6.2 million. Following the filing of the motions, the Debtors and St. Paul engaged in extensive settlement discussions, which culminated in the negotiation of the Settlement, whereby St. Paul agreed to pay the Debtors $4.9 million to resolve all claims.

On January 27, 2003, the Debtors filed their motion (the "9019 Motion") to approve the Settlement pursuant to Bankruptcy Rule 9019(a). The Debtors served notice of the 9019 Motion on all parties listed on the master service list including counsel to Stop & Shop. No objections to the Settlement were filed and this Court so-ordered the Settlement stipulation and signed the Order. Pursuant to the Settlement, St Paul was obligated to wire transfer the settlement payment of $4.9 million within two days after the Order became effective.

Prior to payment, St. Paul was told by Stop & Shop's counsel that not only had Stop & Shop not agreed to assume pre-July 1992 liabilities, but that claims for that period in the range of $2.7–$4 million existed for which the Debtors and/or St. Paul were responsible. Counsel for Stop & Shop also stated its intent to seek recovery from the Debtors and/or St. Paul of

$1.3 million that it had paid to settle workers' compensation claims asserted against Bradlees for the pre-July 1992 period.[1] According to St. Paul, this potential additional exposure changed the basis of the Settlement and St. Paul refused to release the $4.9 million to the Debtors.

St. Paul seeks an order vacating the Order pursuant to Bankruptcy Rules 9023 and 9024.[2]

## Discussion

■ Stipulations of settlement are favored by the courts, especially in bankruptcy matters, and they will rarely be set aside absent fraud, collusion, mistake or other such factors as would undo a contract. *See In re A & C Properties,* 784 F.2d 1377, 1383–84 (9th Cir.1986); *In re North Broadway Funding Corp.,* 34 B.R. 620, 622 (Bankr.E.D.N.Y.1983). *See also In re AL & LP Realty Co.,* 164 B.R. 231, 234 (Bankr.S.D.N.Y.1994) *citing In re Huff,* 118 B.R. 146, 148 (Bankr.S.D.Fla. 1990) (Because "the prompt settlement of claims and disputes make the compromise of claims of particular importance in a bankruptcy reorganization, settlement of bankruptcy claims should be liberally construed and a stricter standard is applied …"); *In re Janet L,* 287 A.D.2d 865, 731 N.Y.S.2d 299, 301 (3d Dept.2001) (The standard is appropriately onerous because stipulations of settlement, particularly those entered into in open court, are favored by the courts and not lightly cast aside). "Bankruptcy courts play a special role in facilitating and approving settlements that enable debtors to reorganize and gain a fresh start." *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 129 B.R. 710, 861 (E. and S.D.N.Y. 1991) *vacated,* 982 F.2d 721 (2d Cir.1992), *modified on reh'g,* 993 F.2d 7 (2d Cir.1993) *citing Janus Films, Inc. v. Miller,* 801 F.2d 578, 582 (2d Cir.1986).

Bankruptcy Rule 9023 incorporates Federal Rule 59, which grants a court the power to alter or amend a judgment after its entry when there has been a clear error in an order of the court or if newly discovered evidence is unearthed. Fed.R.Civ.P. 59(e). *See Bowers v. Andrew Weir Shipping, Ltd.,* 817 F.Supp. 4, 5 (S.D.N.Y. 1993); *In re Bird,* 222 B.R. 229, 235 (Bankr.S.D.N.Y.1998).

Alternatively, Bankruptcy Rule 9024, which incorporates Federal Rule 60(b) provides, in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under

---

1. This recent change in position by Stop & Shop has all the earmarks of an opportunistic strategy. There is no litigation pending before this Court and it is difficult to comprehend how Stop & Shop comes to believe it can assert any claims against the Debtor for payments which it voluntarily assumed to pay under a more than colorable contractual and lawful obligation—postpetition—*without* authority of this court. Moreover, Stop & Shop continued to pay such claims, without objection, for at least two years; failed to file any proof of claim related to those payments and failed to raise any issues regarding those payments or file any objection when it received notice of the 9019 Motion.

2. A hearing on the motion to vacate the Order was conducted on March 25, 2003. Although Stop & Shop appeared at the hearing it did not file any papers or take any position. Following a post-hearing conference, the parties requested that this Court refrain from issuing a decision pending settlement negotiations among Bradlees, St. Paul and Stop & Shop. Chambers was subsequently notified by the parties that those negotiations were unsuccessful.

Rule 59(b); (3) ... misrepresentation, or other misconduct of an adverse party; [or] (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Bankr.P. 9024. St. Paul moved to vacate the Order on several of the grounds set forth in the Bankruptcy Rules 9023 and 9024 but at the hearing conceded that it mainly premises its request for relief on the grounds of mutual mistake.

 "Mutual mistake exists where both parties to a contract are mistaken as to existing facts at the time of execution." *Consolidated Rail Corp. v. Portlight, Inc.* 188 F.3d 93, 96 (3d Cir.1999) *quoting Holt v. Dep't of Public Welfare,* 678 A.2d 421, 423 (Pa.Cmwlth.1996). The doctrine will apply only where the mistake: (i) relates to the basis of the bargain; (ii) materially affects the parties' performance; and (iii) is not one as to which the injured party bears the risk. *Id.* Furthermore, the movant must show the existence of the mutual mistake by evidence that is clear, precise, and convincing. *See Collins v. Harrison–Bode,* 303 F.3d 429, 433 (2d Cir.2002). A party's predictions or judgment as to events to occur in the future, even if erroneous, is not a "mistake." *See Consolidated Rail Corp.,* 188 F.3d at 97. "Were there not such a rule, the effectiveness of settlement agreements would be greatly diminished." *Id.*

 St. Paul argues that the Debtors' themselves represented to St. Paul that Stop & Shop had assumed responsibility for all pre-July 9, 1992 workers' compensation liabilities of the Debtors. Based upon this representation, the experts limited their analysis of St. Paul's potential exposure to the post-July 1992 period. Accordingly, St. Paul argues, the mistaken belief that Stop & Shop had assumed the pre-July 1992 liabilities, which was held by both Stop & Shop and the Debtors, mandates that the Settlement be vacated.

First, it is apparent that there was no mutual mistake. At the time the parties were litigating, negotiating and settling, Stop & Shop *was paying* the Debtors' pre-July 1992 workers' compensation claims and apparently had been doing so for more than two years without objection. It may be that the parties correctly assumed that Stop & Shop is liable for the pre-July 1992 liabilities [3] in which case the "mutual mistake of fact" is really the fear that Stop & Shop might renege on its assumption of those liabilities. In others words, this is not a mutual mistake of fact but instead it is speculation of a future event. *See Consolidated,* 188 F.3d at 96 ("erroneous predictions of future events do not qualify as a mistake."); *In re North Broadway Funding Corp.,* 34 B.R. at 622 (No mistake where factual basis upon which the settlement was reached had not changed from the date of the compromise; only applicant's knowledge of relevant facts had changed.).

**3.** As the Second Circuit has noted, "The practical interpretation of an agreement by a party to it is always a consideration of great weight." *See IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,* 26 F.3d 370, 374 (2d Cir.1994) *quoting In Brooklyn Life Ins. Co. v. Dutcher,* 95 U.S. (5 Otto) 269, 273, 24 L.Ed. 410 (1877). Thus, "[t]here is no surer way to find out what the parties [in this case, Stop & Shop] meant, than to see what they have done." *Id. See also Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); *Ocean Transp. Line, Inc. v. American Philippine Fiber Indus.,* 743 F.2d 85, 91 (2d Cir.1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent."). Should the threatened litigation vis a vis Stop & Shop, the Debtors and St. Paul ripen, the aforementioned caselaw and citations will be of more than passing interest.

Moreover, St. Paul and its affiliates are amongst the largest property and casualty insurers in the United States. In addition to its undisputed sophistication, St. Paul was represented throughout the litigation and resulting settlement by a highly reputable law firm. St. Paul's potential exposure for workers' compensation claims predating July 1992 was a fact within the possession of St. Paul at the time it executed the Stipulation. On its face, at least one of the bonds issued by St Paul, the two page Connecticut bond, provides that it covers claims dating back to 1977. Furthermore, St. Paul actually paid claims predating July 1992 and subsequently sought reimbursement from Stop & Shop, although it is not clear what Stop & Shop's reply was to that request.[4]

■ As noted above, St. Paul also contends that it is entitled to relief on the grounds of newly discovered evidence, misrepresentation and/or extraordinary circumstances. St. Paul, however, has failed to demonstrate any of these grounds. As noted above, the pre-July 1992 obligations of Bradlees clearly existed (if they exist at all) at the time St. Paul agreed to the Settlement as did the possibility that Stop & Shop would renege on its assumed obligation to pay the pre-July 1992 claims. *See In re Chipwich, Inc.*, 64 B.R. 670, 675–76 (Bankr.S.D.N.Y.1986) (newly discovered evidence under Federal Rule 60(b)(2) is evidence that was in existence at the time

of trial of which the moving party was excusably ignorant and which would likely produce a different result). St. Paul had within its power the ability to determine its liability for these obligations and its failure to do so is inexcusable. *See In re North Broadway Funding Corp.*, 34 B.R. at 622 *citing Duchess Music Corp. v. General Music Pub. Co.*, 28 Misc.2d 359, 210 N.Y.S.2d 82, 83 (S.Ct.N.Y.Cty.1960), *aff'd.* 13 A.D.2d 639, 215 N.Y.S.2d 1012 (1st Dept.1961) (no mistake where "what was discovered months after the settlement could have been discovered by investigation prior to ultimate settlement.").

Similarly, in light of the fact that Stop & Shop had assumed paying the pre-July 1992 obligations, St. Paul cannot show that Bradlees made a material misrepresentation. *See* Fed.R.Civ.P. 60(b)(3). And lastly, there has been no showing of "extraordinary circumstances" to justify the vacation of the Settlement. *See* Fed.R.Civ.P. 60(b)(6); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 461 (2d Cir.1994). *See also Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir.1986) ("as (b)(6) applies only when no other subsection is available, grounds for relief may not be mistake, inadvertence, surprise or excusable neglect.").

Alternatively, St. Paul requests that the Court hold this motion in abeyance while the issue of Stop & Shop's liability is determined—presumably through the com-

---

**4.** Apparently, after the Petition Date, Stop & Shop and St. Paul were both contacted by the Commonwealth of Virginia Self–Insurance Commission ("Virginia") which had received complaints from individuals who had not received their weekly worker's compensation benefits. At the same time, Karen Brainard of MAC Risk Management ("MAC"), the administrator of Stop & Shop's workers' compensation program, contacted the Mark Frazier, the Debtors' Director of Risk Management and advised him that Virginia had made a demand on Stop & Shop and that St. Paul

had refused to pay, claiming that its obligations did not start until after July 9, 1992. By letter dated February 20, 2001, St. Paul's Surety Claims Administrator wrote to Mrs. Brainard requesting reimbursement for $28,249.79 representing pre-July 1992 claims that St. Paul had paid and confirming her understanding that "[MAC] will be administering the Bradlees' workers' compensation claims that occurred prior to July 9, 1992, while Bradlees existed as a wholly-owned subsidiary of Stop & Shop."

**314**

mencement of an adversary proceeding by the Debtors. That request is denied. The Debtors should not bear the burden of litigating this issue on behalf of St. Paul. Moreover, the $4.9 million represents approximately 3% of the distribution to unsecured creditors in the Debtors' cases which are almost fully administered and ready to be concluded. Accordingly, the motion to vacate the Order is denied.

IT IS SO ORDERED.